189     179
e205     64

# In re Estate of Stephen Fischer, deceased. Appeal of Franz J. Wehrle, Executor.

*Executors and administrators—Legacy—Release—Fraud.*

A release by a legatee to an executor acknowledging receipt of a sum much less than the legacy as a full payment of the entire legacy will not be sustained where it appears that the legatee had an imperfect knowledge of English; that, although the paper was read to her it was not explained, and she was induced to sign it by a threat made by a friend of the executor that, unless money alleged to be due him by the legatee's husband were paid, harm would be done to her husband.

Where one of two executors transfers his own real estate to a legatee in part payment of the legacy, and the real estate is accepted as such, and no question is raised as to its title, the executors are entitled to credit for the value of the real estate as fixed by the parties at the time the transfer was made.

Argued Nov. 8, 1898. Appeal, No. 148, Oct. T., 1898, by Franz J. Wehrle, from decree of O. C. Allegheny Co., May T., 1897, No. 135, overruling exceptions to adjudication. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Decree modified.

Petition of Helena Weber (née Fischer) a daughter and legatee under the will of Stephen Fischer, deceased, praying the

court to award a citation directed to Herman Fischer and Franz. Joseph Wehrle, executors of the will of said decedent, to show cause why they should not file a final account and settlement of their said trust, having been dismissed, this petition for a rehearing was presented.

In addition to what is contained in the opinion of the Supreme Court, the following facts appear by the opinion of HAWKINS, P. J.:

Stephen Fischer died in 1861, leaving a will in which he gave (1) to his wife a life estate in his realty and a right to the use of the principal if necessary to her comfortable maintenance, and the residue to his three children, including this petitioner; and (2) to his children the personal estate, and appointed his son Herman and his son-in-law, F. J. Wehrle, executors, and the latter trustee. The widow seems to have accepted under the will and Wehrle assumed the active duties of the trusts. An account, which included the real estate converted under a power in the will, was filed in 1862, showing a balance of $4,197.64 in the executors' hands, of which no audit was had. The widow died April 3, 1876. In 1880, a citation was issued at the instance of Helena Weber, the present petitioner, to show cause why the executor should not file a final or further account and settlement of the business of said estate, service of which was accepted by "Weir & Gibson, attorneys for F. J. Wehrle," but no answer was filed, and the matter was admittedly never brought to the attention of the court until the present hearing. Mr. Wehrle set up in his answer to the present petition a written release, dated March, 1876, purporting to have been signed by Mr. and Mrs. Weber, acknowledging to have received $225, " being balance in full due after deducting all former payments made by them (the executors) to us of all our full share purpart and dividend of the sum of thirteen hundred and six ($1,306) dollars, which by the terms of the last will of said Stephen Fischer, was to be distributed and divided amongst the children of said decedent after the death of his widow, Ginnevev Fischer, the mother of the said Helena Weber, and Caroline Wehrle." The respondent when examined at the hearing professed to have no recollection whatever of how this release came into existence or his possession. He

never in fact had possession of the assets; but a Mrs. Baucher, a resident of Ohio, since deceased, who was familiar with the decedent's affairs, took possession and undertook administration at his request. " I never got any money in," said he, " and never paid any out. . . . I got no papers in hands again. I gave them all over to Baucher to settle the whole thing. I had nothing to do with dividing it. Baucher divided it. . . ." No receipts nor evidence for the " former payments " alleged in the release to have been made was produced; no evidence was offered that such explanation of the contents of this release as Mr. and Mrs. Weber's defective knowledge of the language required, was given; and the sanction of this court as in the ordinary course of settlement was never sought. The defense was rested entirely on the release. No explanation was given as to why it was not adduced in response to the citation of which respondent admittedly had notice in 1880.

On the other hand the explanation which Mrs. Weber gives of her delay is pathetic. " I did not get any money seventeen years ago. Mr. Edmundson had the case and I was in poor circumstances, and could not get along to push it any farther as I had no money. I saved and scratched for what I got now. I can now pay all costs. It took me thirty years to raise all that money." Petitioner's appearance and manner were in keeping with hope deferred and the hardship of her fate.

In respect to the release with which Mrs. Weber is now for the first time confronted, she admits the signature to be hers, and that what purported to be its contents was read to her; but declares that owing to her defective knowledge of English she did not understand its operation. The whole transaction seems to have sprung out of a fear from threats which were made, and which would naturally absorb her mind to the exclusion of other considerations. Herman Voeghtly, a friend of Wehrle, had demanded wages which Weber owed him and threatened " harm " if they should not be paid. She and her husband had therefore asked Mr. Wehrle for money and were told that they must first sign a paper before 'Squire Evans, which he handed them. Here the story is best told in her own words : " We did not understand it, nor did he tell us what was in the paper. . . . I never went to English school, we spoke German all the time. I could not read nor write English then because

we had the mother language all the time; 'Squire Evans read the paper to us; but I did not understand it, nor did my husband either.   I could speak a little English at that time; but didn't understand what was said.   All I ever received was the $225.   He (Wehrle) never paid me any other money."   Mrs. Weber showed in giving her testimony that her knowledge of English was indeed small; and the release covering as it did a page of legal cap and couched in technical phrase would have required study of any unprofessional person having a competent knowledge of English to understand.   The manner of this witness left no doubt in the mind of the court that she at least believed in the truthfulness of her story.   There was no perceptible attempt to extenuate or conceal anything.   Statements which apparently told against were as freely given as those which told for her.   All the original participants in the execution of the release except Mr. Wehrle and herself being dead, this was her only available direct evidence; but the improbability that so large an amount as her share in the estate should have been advanced pending the life estate, the absence of any receipts for the alleged "former payments," the executor's gross neglect of the duties of administration, and his suspicious failure to bring the release to the attention of this court for so many years, even after citation, are circumstances which are strongly corroborative of her story.   On the other hand, while the answer as filed sets up the release as a defense, the respondent himself when orally examined made no direct denial of Mrs. Weber's story, but professed entire ignorance of the whole matter.   The release therefore stands alone and must yield to the weight of adverse evidence.

It must be conceded that the statute of limitation has no application to this case; for there was not only an express trust imposed upon this respondent by the will (York's App., 110 Pa. 69), but there is a decree of this court standing unsatisfied which showed his liability: Vincent v. Watson, 40 Pa. 306.

The plea of laches comes with a peculiarly bad grace from this respondent; for he was himself continuously guilty of gross laches from the grant of letters.   Instead of attending himself to the performance of duties of the trust which he had assumed under the direction of this court in accordance with his oath of office, he delegated them, and turned over the whole

assets to a nonresident agent, and by his own confession took no part in the administration. Even the citation from this court was insufficient to stir him to a sense of his duty. "By transacting the business as the law requires, no injury would have befallen anybody:" Eberts v. Eberts, 55 Pa. 110. That this was not done was owing primarily to the trustee's default. It was his duty to have sought a settlement under the sanction of this court of his own motion: Peebles's App., 15 S. & R. 41; and as a matter of common prudence, he should have done so, because the citation must have suggested to his mind a pending question of the validity of the release which he held. Settlement would then have been comparatively easy and inexpensive when all the parties to the release were living and the facts were fresh. The duty of initiative was on the trustee who ought not to take advantage of his own default. The penalty for delay should be imputed rather to his neglect of duty than to the poverty of his cestui que trust.

On the other hand, the poverty of Mrs. Weber, which caused her long delay in calling on her trustee for settlement, is but an added hardship; and in no sense to be imputed to her as a fault. If, as she testifies, Mrs. Weber understood the paper which she signed to relate solely to the payment then made, and if as clearly appears she remained ignorant of its scope until the answer was filed, there is no ground upon which the suggestion of acquiescence can rest; for acquiescence implies knowledge of the facts from which it is sought to be drawn. There is nothing therefore left to sustain the plea of laches but mere lapse of time; and that is clearly insufficient. Trustees are but official custodians whose duty it is to maintain the sanctity of the estate for those who are beneficially interested; and are prohibited by an essential law of their trust from taking any personal advantage. The necessary implication is that so long as any part of the trust assets remained unadministered, trustees continue liable to answer those who are beneficial owners. Where laches is of such a character, taken in connection with other facts, as to be a fraud on the trustee, it will of course estop; but where the facts are within the knowledge of the trustee he acts at his peril outside judicial sanction: Eberts v. Eberts, supra. The real question in this case is then whether

or not this petitioner received from respondent the full share to which she was justly entitled in her father's estate. For he had no right to withhold a part and give ι part. The release is presumptive evidence of payment in full; but this presumption is rebuttable: "If advantage is taken of the ignorance and want of knowledge of the releasor it is invalid." Thus, it is well settled that a release taken by a guardian shortly after his ward becomes of age, without settling an account, for an inadequate consideration, will be set aside. "A written release directly to the guardian," said BLACK, C. J., in Wills's App., 22 Pa. 332, "executed with all due solemnity by the ward, after he becomes of age and without a perfect knowledge of his affairs will not stand a moment in any court of equity unless it can be proved that the consideration he received was a full equivalent for the right given up." "A court of justice," said WOODWARD, J., in Hawkins's App., 32 Pa. 263, "will not permit such transactions to stand unless the circumstances demonstrate in the highest sense of the term full deliberation and uberrima fides." The rule grows out of the ward's lack of experience with the business, and of familiarity with the condition of the estate, and the corresponding duty of protection which inheres in the guardian's office. The benefit of the experience and the knowledge acquired in virtue of his office by the guardian, are as much the right of the ward as the assets proper, and should be imparted according to his needs. The reason of the rule is equally applicable to other cestuis que trustent in like dependent condition. The duty of protection is measured by the intelligence of the cestui que trust; for the less the intelligence the greater the need. Thus a release obtained through misrepresentation or suppression of the truth by one who voluntarily assumed a relation of confidence toward nonresident legatees was set aside in Brooks v. Church, 128 Pa. 408. So a release obtained by trustees from nonresident cestui que trustent by payment of half their share of the trust estate is fraudulent and void: Bixler v. Kunkle, 17 S. & R. 298. So where an executor obtained a release upon representation that no legacy had been given, which was false, it was set aside even though the record which was accessible to the legatee, would have shown its falsity: Hunt v. Moore, 2 Pa. 107. So where a donee stands

in a confidential relation to an illiterate donor, the burden is on him to show that the gift was "free, intelligent and uninfluenced:" Corson's App., 137 Pa. 160. So an assignment made by an old, illiterate German, unable to read or write English and speaking and understanding it imperfectly, was set aside upon the ground that it was not freely and voluntarily made with full knowledge of the nature of the act, and its effect upon the donor in relation to his estate: Hasel v. Beilstein, 179 Pa. 560. The result of the authorities in brief is that relief will be granted by courts of equity whenever a release has been obtained by means of fraud or misrepresentations, suppressio veri or suggestio falsi, or has been executed by one ignorant of his rights, and not in a situation to inform himself of them. So when undue advantage is taken of the weakness or necessities of the party, or when there exists a confidential personal relation, as if obtained by the guardian from his ward, shortly after coming of age, or by an attorney from his client, or by a trustee for his cestui que trust (Deardorff's App., 6 Watts, 160), and the measure of relief is the amount which remains unpaid.

The confidential relation of the parties in cases of this kind differentiates the measure of proof from that which prevails in transactions between strangers. The trustee receives the assets without consideration for the benefit of his cestui que trustent in his official capacity; his position, by reason of his experience and his acquired familiarity with the facts of administration, gives him peculiar advantages for abuse, and at the same time disarms the vigilance of his cestui que trustent; hence it has been found essential to the sanctity of trust estates that he should be held to strict proof, and his cestui que trustent be treated with liberality, in the investigation of his administration; whereas another standard is appropriate to strangers, who deal at arms' length, on equal terms, for the temporary purposes of trade, in the conservation of their respective interests: Bixler v. Kunkle, supra. For this reason it has been held that a release taken by a trustee will be operative for nothing more than has been actually paid: Bixler v. Kunkle, supra. It is at best no better than a receipt, and only prima facie evidence of payment. Even if treated as a covenant not to sue, it is quite as assailable: Eberts v. Eberts, supra. And

why should Mrs. Weber not be permitted to assail the release adduced here? She was admittedly a competent witness to show fraud or mistake in the execution; and how can her credibility be questioned when she is strongly corroborated by the conduct, and even by the testimony, of respondent himself? If, as the weight of evidence shows, her story be true, the respondent has trust funds which he ought to pay and she is entitled to receive.

The facts bring the present case within these principles. Advantage was taken of petitioner's weakness, necessities and ignorance to obtain a release from her which, owing to her defective knowledge of English, she was incapable of understanding without explanation in the German, which was her "mother language;" but no such explanation was given, although it was plainly the executor's duty. The consequence was that trusting to the executor and moved by her anxiety, she signed the release in ignorance of its scope and without full consideration for her share of her father's estate. Her wifely anxiety to protect her husband from threatened "harm" might have induced her to sign, even with a full knowledge of the contents of the release; but who would even attempt to justify her trustee in taking advantage of her weakness or necessity? It is clear that the release will be operative for nothing more than has been actually paid: Bixler v. Kunkle, supra. The executor could not acquire any beneficial interest in the estate without a breach of trust, and must therefore respond to petitioner's claim.

The court entered the following decree:

And now, to wit: April 23, 1898, this matter came on for hearing, upon petition of Helena Weber (daughter of said decedent), for rehearing and answer thereto, and testimony taken, and was argued by counsel, and upon consideration thereof it is ordered, adjudged and decreed that Franz J. Wehrle, acting executor of the will of Stephen Fischer, deceased, pay to petitioner, Helena Weber, the sum of $2,711.25, being in full of her distributive share of the balance, as shown by account filed at No. 31, June term, 1862, as per calculation hereto attached, and that the costs be paid by executor.

## STATEMENT.

| | | |
|---|---:|---:|
| Balance as per account, . . . . | | $4,197 64 |
| Share of Helena Weber, one third, or $1,399 21 | | |
| Less amount paid on account, . | 225 00 | |
| Balance due, . . . . . . . | | 1,174 21 |
| Interest thereon from July 1, 1876, | | |
| to date, . . . . . . | | 1,537 04 |
| Balance due Helena Weber, . . . | | $2,711 25 |

*Error assigned* was the decree of the court.

*F. P. Sproul,* with him *Thomas M. Marshall, Jr.,* for appellant.—Appellant's contention is that after twenty years Mrs. Weber's share was presumed to be paid, and there is nothing to rebut the presumption: Rhone on Orphans' Court Practice, p. 225, sec. 102; App v. Dreisbach, 2 Rawle, 287; Thompson v. McGaw, 2 Watts, 161; Bentley's App., 99 Pa. 500; Com. v. Snyder, 62 Pa. 153.

Petitioner was guilty of laches: Waring v. Penna. R. R., 176 Pa. 172; Eberts v. Eberts, 55 Pa. 110; Yorks's App., 110 Pa. 69.

Petitioner is concluded by her release: Wills's App., 22 Pa. 332; Hawkins's App., 32 Pa. 263; Bixler v. Kunkle, 17 S. & R. 298; Hunt v. Moore, 2 Pa. 105; Corson's Est., 137 Pa. 160; Hasel v. Beilstein, 179 Pa. 560; Deardorff's App., 6 Watts, 159; Wentz v. DeHaven, 1 S. & R. 317.

*A. V. D. Watterson,* with him *William A. Golden* and *A. B. Reid,* for appellee.

OPINION BY MR. JUSTICE FELL, January 2, 1899:

The finding of the court that the release signed by the appellee in 1876 in which she acknowledged in full the receipt of her share of her father's estate, was not under the facts developed at the hearing conclusive against her, should not be disturbed. It is fully sustained by the very able opinion filed by the learned president judge of the orphans' court. But we are unable to see upon what ground the appellant was denied credit for $1,000, the value of the realty in Ohio which the appellee received from her brother, Herman Fischer. He was one of the executors, and conveyed to her the real estate at a price agreed

upon by them in part payment of her distributive share. The conclusion which we have reached upon this subject, differing from that of the orphans' court, is not one which depends upon the credibility of witnesses or the weight to be given to conflicting testimony. The testimony is all one way, and is given by the appellee herself. She testified : " My brother, you know, was an executor and he gave me that property in Ohio for $1,000 of my father's estate, he allowed it on my father's estate. I accepted it as a payment on account, I was agreed, I was satisfied what I got, for I had to take what I got. I got the property of $1,000 and got $225 in cash ; my husband got the cash. . . . . I said to him what is in black and white what my father left me I want, I want my share. It was then this question arose about the house and lot. It is no farm. My brother turned that over to me and gave me a deed for it. I went there I think in 1862. My brother said he gave me the property for $1,000. My brother he never gave me any money at all he gave me this house and lot, and the other executor gave me $225." This testimony was given by the appellee, and was the only testimony upon the subject; it was not qualified or explained in any way.

That the real estate transferred was the individual property of Herman Fischer, which he took at the appraisement, does not affect the matter. He was one of the executors, although not the active one, and the transfer was in part payment of the legacy. The claim 'of the appellee was as fully discharged as if he had used his own money instead of the real estate in paying the legacy. As the appraised value of the real estate transferred was charged against his distributive share, it may be that he has a claim against his coexecutor. We find no evidence that the payment failed because Fischer was unable to make a good title. He assumed to take title under the will, and conveyed by deed to his sister, and she sold it to the present owner. It may be that at that time, and until the death of the widow, Fischer had not a marketable title, but no question as to the title was ever raised by the parties in interest. Good or bad they have been satisfied with it.

By crediting the accountant with $1,000, the value of the real estate, the balance due Helena Weber is reduced to $174.21 with interest from July 1, 1876. As so modified the decree is affirmed.